WESTON ELECTRICAL INSTRUMENT CO. v. EMPIRE ELECTRICAL
INSTRUMENT CO. et al.

(Circuit Court, S. D. New York.  June 10, 1904.)

No. 4.

1. PATENTS—INVENTION—ELECTRIC SHUNT.

The Weston patent, No. 497,482, for a shunt for electric light and power
stations, specially adapted to the measuring of very strong electric cur-
rents, and in making which short plates of metal of high resistance are
used, with air spaces between them, and connected with massive terminals
of metal having a lower resistance, was not anticipated, and discloses in-
vention of high order.  Evidence also considered, and *held* not to show
prior use by defendants.  The patent also *held* infringed.

In Equity.  Suit for infringement of letters patent No. 497,482, for
a shunt for electric light and power stations, granted to Edward Weston
May 16, 1893.  On final hearing.

William Houston Kenyon and Richard Eyre, for complainant.
Philip Mauro and C. A. L. Massie, for defendants.

HOLT, District Judge.  This is a suit to restrain the infringement
of a patent, No. 497,482, dated May 16, 1893, issued to Edward Weston,
and now owned by the complainant, for a shunt for electric light and
power stations.  There are no questions as to jurisdiction, parties, or
title.  The proof of infringement is conclusive, and is not controverted.
The substantial defenses relied on are that the patent in suit is invalid
for lack of invention, for insufficient disclosure in the patent, and for
public use more than two years before the application.  An electric
shunt is an additional course or side track established for the passage
of part of an electric current.  The use of a shunt for the measurement
of small or ordinary currents of electricity was well known long before
the Weston patent.  The usual method of construction was to intro-
duce into the wire or vehicle carrying the electric current a metal of
greater electrical resistance, and to connect the two terminal portions of
such metal by wires with a measuring instrument.  A portion of the
current was thus shunted off and passed through the measuring instru-
ment.  The portion of electricity flowing over the shunt, as compared
with the portion flowing over the main current, being ascertained, the
force of the entire current could be computed by the measurement of
the shunted current, and for the purposes of measurement the use of
such a comparatively small current was found more convenient than to
undertake to apply a measuring instrument to the entire current.  The
great difficulty was in applying a shunt to a very large and powerful
current of electricity, owing to the fact that the metal of higher resist-
ance constituting the shunt would become so heated by the resistance
of so large a current as to become redhot or fused.  With the gradual
development of the commercial use of electric power, it became neces-
sary to employ currents, particularly at electric light and power sta-
tions, of constantly increasing strength, and it became of great im-
portance to devise accurate measuring instruments for such large cur-
rents.  Prior to Weston's patent in 1893, no practical method for the

use of a shunt in connection with the measuring instruments for such large currents had been found, although the necessity for such an instrument was thoroughly appreciated, and many electricians all over the world attempted to invent one. In actual practice, no shunt at that time was used. The measuring instrument was applied to the entire current, but the result was unsatisfactory. The measuring instruments were complicated, inconvenient, and expensive, and the measurements which could be made by them were inaccurate and unsatisfactory. The essential problem in discovering a shunt which could be used with a powerful current was not electrical, but thermal. The question was how to avoid excessive heat at the shunt. The efforts, previous to Weston's, to solve the problem, consisted substantially in attempts to construct a shunt which should have a sufficiently large resisting mass to heat slowly, with various appliances or methods for keeping it cool. Weston's invention consisted in constructing a shunt consisting of short plates of high resistance, arranged with air spaces between them, and directly connected with massive terminals, the object being to have the heat generated in the short plates of high resistance rapidly removed by the joint action of radiation through the massive terminals and the cooling influence of the air. Instead of making the plates of high resistance long, so that they would heat slowly, they were made short, so that they would heat quickly, but, being inserted in massive terminals at each end, consisting of a metal of less resistance, and being surrounded by air, the heat was dissipated quickly. The heat generated in the short plates of high resistance reached a certain degree of temperature very quickly, and thereupon substantially all further heat was effectively dissipated, so that the degree of heat in the plate of high resistance quickly became and remained substantially uniform. The result was a shunt capable of successfully measuring an electric current of enormous power. The instruments manufactured under Weston's patent immediately entered into substantially universal use in all large central electric power and light stations, and have ever since been used almost exclusively as ammeters of large electric currents.

The defendants claim that Weston's patent was invalid for want of invention, claiming that he borrowed all the ideas in his shunt from shunts previously patented or described. The defendants pleaded in their answer that the invention had already been disclosed and patented in certain patents, naming about 70 United States patents and 13 French patents previously issued to Weston, and 98 American patents, 41 English patents, 22 French patents, and 4 German patents previously issued to other persons. The answer also alleged that the invention was described in about 50 enumerated publications. The defendants have given in evidence a few of these patents and publications, and in their brief rely upon a previous patent for a shunt issued to Weston, and other shunts known as the Queen shunt, the Edison Shunt, the Anderson shunt, the Franklin Institute shunt, the La Roche shunt, and the Vienna and Munich shunts. An elaborate argument has been made that Weston's shunt in suit is the same in principle as all the other shunts, but, in my opinion, it is radically different in principle. The basic idea of a shunt, of course, is fundamentally the same; that is,. some metal of higher resistance than the conducting metal is inserted

for the purpose of shunting off a portion of the current. But all the shunts relied upon by the defendants were shunts which made no use of the methods which Weston used to dissipate the heat in the case of a large current. None of them had struck upon the idea of making the plates of high resistance short, so that the heat in them would be rapidly absorbed by the terminals, and none of them had hit upon the idea of making the terminals massive, so that they would radiate a large amount of heat rapidly from the plates of high resistance. I think that Weston's patent not only embodies invention, but that it embodies invention of a very high and superior order. It adopted a method of dissipating heat which was not only novel, but was in a line entirely opposite to the direction in which all other electricians had been working. The defendants lay especial stress upon the case of the Weston patent, No. 496,501, for a shunt. This patent was applied for on the same day as the patent in suit, but was issued about two weeks earlier. The defendants contend that it is, therefore, an underlying patent, which claim, under the authorities, I think is correct; and that it is a patent for the same invention as the patent in suit, which claim, in my opinion, is entirely incorrect. The earlier patent makes no claim for short plates of high resistance joined with massive terminals as a method of dissipating heat. The defendants also seem to place great reliance on the Franklin Institute shunt as having anticipated Weston's invention, but I cannot see that it anticipated it at all. It was a shunt; but its plates of high resistance were long, not short, and its terminals were not massive. It was an instrument designed for laboratory use. It was not calculated for commercial use, and was never in fact employed, and is impracticable to be employed, for practical commercial purposes. The so-called La Roche shunt is admitted by the defendants' counsel to be further from Weston's invention than the Franklin Institute shunt; and, in my opinion, the so-called La Roche shunt and all the others that have been referred to have nothing in common with the Weston shunt in suit.

The defendants allege that Weston did not comply with the statute requiring his invention to be described in such full, clear, concise, and exact terms as to enable any person skilled in the art to make it. Great stress is laid on the fact that the claims of the patent do not specifically state that the plates of high resistance should be short, or designate the exact length or size of the parts of the shunt. It is true that the invention must be stated in the claim, and must be fairly included within it. But the claim must be read in the light of the specifications and drawings; and if the invention, as a whole, is fairly stated in the claim, and the claims, with the specifications and drawings, enable a person skillful in the art to construct the thing invented, the patent is sufficient. In my opinion, the claims in this patent sufficiently describe the invention, and all the parts of the patent read together afford a sufficiently clear and exact description of the thing invented to enable a person skilled in the art to construct it. The fact that no precise dimensions of the short plates or the massive terminals are given is certainly immaterial. The length of the plates of high resistance and the size of the metal terminals must necessarily vary to some extent with the size and force of the current and the circumstances under which

the shunt is to be used.    Under such circumstances, absolute precision was not feasible or necessary.

The defendants allege that La Roche, the president of the defendant F. A. La Roche Company, made public use of the invention more than two years before Weston's patent was applied for.    La Roche testified that he constructed in or about 1884 an instrument called a "voltmeter" and a shunt, and that from about 1884 until about 1888 or 1889 he used this shunt in connection with this voltmeter as a measuring instrument, for the purpose particularly of testing storage batteries, at his workshop in Germantown or Philadelphia.    In my opinion, the shunt in question does not embody Weston's invention, and, even if La Roche's testimony as to the use of this shunt in 1884 and afterwards were true, it would not prove a prior use of Weston's invention.    But if the shunt produced by La Roche embodied the principle of Weston's invention, I am entirely convinced that La Roche's entire testimony as to the use at any time between 1884 and 1893 of the shunt which he produces is incorrect.    A very large amount of testimony has been taken bearing upon the accuracy of La Roche's testimony, which it is unnecessary and impracticable to consider in detail.    The evidence establishes, in my opinion, that the instrument called a "voltmeter" was formed by putting together a number of instruments or parts embodying different inventions, none of which had been made or was known to electricians before Weston applied for his patent; that it would have been a marvelous and almost impossible thing for the most skillful electrical inventor at that time to have devised such an instrument; that La Roche is a man not only without any scientific education, but without even the ordinary electrical knowledge of a skillful electrical mechanic; that his reputation for veracity is bad; that his shunt never was used as a measuring instrument in connection with his voltmeter between 1884 and 1889; that the various pieces of apparatus constituting the voltmeter were put together by La Roche after the issue of the patent in suit to Weston, with the object of being used in support of his own untruthful testimony to be given in this and other suits for the purpose of attempting to invalidate this and other patents issued to Weston; that a part of the apparatus contained in the said voltmeter are two magnets, which are so arranged that their poles neutralize each other; that, as a result, it is impossible for a current of electricity, in passing through the instrument, to move the coil; that therefore the instrument is, and always has been, entirely inoperative, and the shunt could not have been used as a measuring instrument in connection with it. In short, I cannot avoid the conclusion that the testimony of La Roche in this case was deliberately and intentionally untruthful, and that to support it he deliberately fabricated an instrument to be used upon this trial and other trials involving Weston's patents.    It was a careful, premeditated, and elaborate attempt by untruthful testimony, fortified by fabricated exhibits, to deprive Weston of his just rights in his inventions, to impose upon this court, and to pervert the course of justice. I direct that the evidence and exhibits in this case be submitted to the District Attorney, in order that he may take under consideration the question whether a prosecution should be brought against La Roche for perjury.

The evidence of La Roche as to the use of this shunt in the 80's is corroborated by two witnesses—Toplis and Hanks. I am satisfied that their evidence is incorrect, but I am not satisfied that it was willfully untruthful. It may have been mistaken. I think it is proper, however, that the question of their truthfulness should also be submitted to the District Attorney.

Complainant's counsel claims that the damages in this case should be increased under the statute on the ground that the defense has been unconscionable. I think that that question will properly arise on the coming in of the report on the accounting.

My conclusion is that there should be a decree for the complainant, granting a perpetual injunction, with costs and disbursements, and a reference to take an account of the damages and profits.